Filed 12/2/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re T.G., A Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>Natasha B.,<br><br>        Defendant and Appellant. | A144548<br><br>(Alameda County<br>Super. Ct. No. OJ14-023058) |

In this dependency appeal, Natasha B. (mother) seeks relief from the juvenile court order terminating her parental rights with respect to her youngest daughter, T.G. (born June 2013), pursuant to section 366.26 of the Welfare and Institutions Code.[1]  At the November 2014 dispositional hearing in this matter, mother was bypassed for reunification services in accordance with subdivisions (b)(10) and (b)(11) of section 361.5.  Pursuant to those statutes, reunification services need not be offered to a parent if the court has previously terminated reunification services or parental rights with respect to a sibling or half sibling of the child and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling  . . . ."  (§ 351.5, subd. (b)(10) & (11).)

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

Mother argues that bypassing her for reunification was improper because the orders terminating services and parental rights with respect to T.G.'s half siblings were on appeal at the time of T.G.'s dispositional hearing and therefore could not provide an appropriate basis for bypass. She further asserts that—since the juvenile court's bypass decision was based on a patent legal error which violated her due process rights—she has not forfeited the issue, despite her failure to raise it in the juvenile court or timely pursue it in this court. Because we conclude that the juvenile court did not err in relying on subdivision (b)(10) to bypass services for mother under the facts of this case, we need not consider mother's other contentions and affirm the juvenile court's order terminating parental rights.

## I.  BACKGROUND

T.G., the minor who is the subject of these proceedings, was detained by the Alameda County Social Services Agency (Agency) on June 10, 2014, when she was eleven months old. In its petition filed two days later, the Agency alleged that T.G. was at substantial risk of harm because Natasha B.'s numerous emotional, mental health, and substance abuse problems interfered with her ability to properly care for the minor. The petition referenced a number of recent examples of mother's neglect. For instance, on May 29, 2014, mother called staff at the shelter where she was staying and asked them to pick her up at the BART station because she was unable to make her way home. When a staff member arrived, mother appeared quite intoxicated and was sitting on the curb with T.G. in a stroller next to her. The staff member had to help mother stand and navigate the stroller because mother was unable to push the baby. On June 2, 2014, mother, who again appeared intoxicated, reported to shelter staff that she had an altercation with a store owner while T.G. was in her care. According to mother, the store owner pulled her hair and she ripped his pants pocket, causing a wad of bills to fall out. Mother then stole the $900 and fled down the street with T.G. in the stroller. That same day, mother was observed yelling and cussing at the minor while doing her hair. On June 3, 2014, shelter staff had to intervene when mother, who admitted she was again intoxicated, vomited on

2

herself and the minor. Finally, mother had a history of marijuana use, and, according to staff, she smelled of marijuana while caring for T.G.

Sadly, mother was, herself, involved with the child welfare system as a minor, with 45 referrals involving the maternal grandmother's substance abuse and mental health issues dating back to 1988. The family received services from March 1994 through October 1996 and from April through August 1999. In 2007, when she was 16 years old, mother was briefly taken into protective custody after a physical altercation with the maternal grandmother. Mother was reported to be difficult to manage and associated with older individuals who would buy her alcohol. She was threatening to people at school—breaking someone's nose, almost breaking someone's jaw, and breaking three of her teacher's teeth.

Mother also had a history of psychiatric hospitalizations, with seven admissions prior to 2006. She had been involuntarily detained pursuant to section 5150 three times, including once in 2007 after she threatened to hit a cousin with a carjack.[2] At the time T.G's petition was filed, however, mother was not engaged in mental health treatment. In addition, mother was reported to have neurological damage from a car accident when she was a child, which left her with significant cognitive delays. Mother had also been arrested on a number of occasions and, when T.G.'s petition was filed, was on probation for resisting a police officer (Pen. Code, § 148, subd. (a)) and disturbing the peace (Pen. Code, § 415), based on separate incidents occurring in 2009.

In March 2014, mother had been referred for voluntary services after it was reported that T.G. had three large scrapes on her bottom and that mother did not have stable housing. Although mother was referred for numerous services, including services

---

[2] Section 5150 provides in relevant part: "When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services."

through the local Regional Center, she failed to follow through. Moreover, despite assistance from both the Agency social worker and her case manager from Through the Looking Glass, a resource center for parents with disabilities, mother had failed to secure stable housing.

Also of significance to the disposition in this case, mother has two older daughters—C.B. (born March 2010) and J.M. (born February 2011)—who were removed from her care in March 2012 due to allegations of neglect. According to the operative petition in this sibling case, the two minors were at substantial risk of harm because mother's criminality, housing instability, mental health issues, and substance abuse impacted her ability to adequately care for and protect them. For instance, in July 2011, mother had been arrested for child endangerment (Pen. Code, § 273a, subd. (a)), after riding with J.M. in a vehicle driven by an intoxicated person. Upon investigation, it was discovered that the infant's car seat had not been attached to the vehicle. The petition further recounted mother's history of housing instability, noting that the family was living with the maternal grandmother at the time of detention, "which presented a serious risk to the minors due to the grandmother's serious mental health issues, substance abuse issues, and previous [child welfare] history with her own children." Mother's history of psychiatric hospitalizations and lack of current mental health treatment, despite her demonstration of behavior consistent with an ongoing mental illness, was also described. Finally, the petition detailed mother's historic marijuana use and reported that C.B. had tested positive for marijuana at birth.

Mother was offered reunification services with respect to C.B. and J.M., but these services were terminated in June 2013—the same month that T.G. was born—due to her failure to reunify. On July 31, 2014, the juvenile court terminated mother's parental rights with respect to both C.B. and J.M. We recently issued an unpublished opinion

4

upholding the juvenile court's decision terminating parental rights. (*In re C.B. et al.* (Sept. 2, 2015, A142238 & A142718) [nonpub. opn.].)[3]

As for T.G., she was formally detained in the home of her paternal grandmother on June 13, 2014.[4] Father supported placement with the paternal grandmother. He reported concerns about mother's ability, but would not go into detail. According to the Agency, mother had shown "an inability to protect the minor when she engages in substance abuse, criminal activity, and/or her violent behaviors, all with the minor in her presence and care." Moreover, in the Agency's opinion, mother's developmental delays impacted her ability to make appropriate decisions and properly parent T.G.

While jurisdiction and disposition were pending, mother did complete an assessment with the local Regional Center, and her case manager planned to refer her to the Center's Independent Living Program (ILP). Mother also entered a residential treatment program in July 2014, but left after two days. Staff reported that she was getting into arguments with other clients and was not willing to abide by the rules of the program. Thereafter, she claimed to be receiving counseling and substance abuse treatment through a local clinic, but failed to provide requested contact information so that this could be verified. In October 2014, mother's ILP worker reported that mother had left her several messages in which she sounded intoxicated. When the social worker asked mother about this report, mother became angry, yelling and swearing. Further, when the social worker suggested that mother could clear up the matter through drug testing, mother declined. At that point, mother was living in a homeless shelter. She had not been participating in Regional Center services.

_____

[3] On May 12, 2015, we granted—without any determination of relevance—mother's May 11 request that we take judicial notice of the record and briefing filed with this court in the consolidated appeals of C.B. and J.M. As we discuss later, we have reviewed mother's January 2014 petition filed pursuant to section 388 in the sibling case and the related hearing transcripts. We otherwise find these materials irrelevant to our decision and have therefore not considered them.

[4] T.G.'s biological father, also T.G. (father), has not appealed and is not involved in these proceedings.

5

Although mother had originally contested both jurisdiction and disposition—and the proceedings were therefore continued repeatedly—when the hearing was actually held on November 4, 2014, mother withdrew her request for a contest and submitted both matters. The juvenile court therefore found the allegations in the petition, as amended in court, true and concluded that the minor was a person described by subdivisions (b) and (j) of section 300. Thereafter, noting that mother's progress toward alleviating or mitigating the causes necessitating T.G.'s placement had been "minimal at best," the juvenile court declared the minor to be a dependent child and denied both parents reunification services. A hearing was set for February 26, 2015, pursuant to section 366.26 so that a permanent plan could be developed for T.G. Neither parent sought writ review of this setting order.

In its report filed in advance of the permanency planning hearing, the Agency recommended that T.G. be adopted by the paternal grandmother. Father was apparently in favor of this outcome. Mother had been visiting T.G. irregularly in the home of the paternal grandmother, despite the Agency's offer for assistance with transportation and a set visitation schedule. On December 7, 2014, mother showed up unexpectedly and, after the grandmother agreed to supervise a visit in front of the house, mother exclaimed: " 'You're not going to take my child from me.' " She also screamed and cursed at the grandmother, threatening to have people come to the home. Although mother later called to apologize, mother's supervised visitation was moved to a neutral setting. In the opinion of the Agency, mother continued to struggle with the same issues that led to T.G.'s removal and had a "years-long history of being unable to care for her children, even with many supportive services from the Agency and elsewhere."

At the permanency planning hearing on February 26, 2015, mother testified in opposition to the Agency's recommendation. She indicated that she had been taking parenting classes and receiving drug and alcohol education. Mother also stated that she was attending N.A. meetings, participating in Regional Center services, and visiting with T.G. She continued to look for housing. Mother described her relationship and ongoing contact with T.G., and her attorney argued that mother's parental rights should not be

6

terminated based on the beneficial relationship exception to adoption—that is, that mother had consistently visited with the minor and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).)

Nevertheless, at the conclusion of the permanency planning hearing, the juvenile court found T.G. adoptable, declined to apply the beneficial relationship exception to block T.G.'s proposed adoption, and terminated the parental rights of both mother and father. In reaching this decision, the court noted that the case involving T.G.'s half-siblings was on appeal and needed to be followed by all of the parties because the appellate decision "could have ramifications" in T.G.'s case that would need to be addressed. Mother's timely notice of appeal brought the matter before this court.

## II. DISCUSSION

### A.    *Forfeiture Issues*

Mother contends that reversal is required in this case due to multiple errors in the dependency proceedings involving T.G.'s half-siblings (C.B. and J.M.), matters which were pending before this court at the time she briefed the present appeal. Since we recently rejected all of these claims, upholding the juvenile court's decision to terminate mother's parental rights with respect to C.B. and J.M. (*In re C.B., supra,* A142238 & A142718 [nonpub. opn.]), these arguments are no longer available to mother. Thus, her sole remaining theory in this case is that the juvenile court erred as a legal matter when it bypassed her for reunification based on the orders terminating services and parental rights with respect to T.G.'s half siblings, because those orders were on appeal, and therefore not final, at the time of T.G.'s dispositional hearing.

It is undisputed, however, that mother did not object in the juvenile court on this basis. Rather, she submitted the matter of T.G.'s disposition to the juvenile court for its determination. Generally, such a failure forfeits a parent's right to pursue the issue on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 & fn. 2 (*S.B.*), superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338-1339; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-413.) Indeed, although an

7

appellate court has the discretion to excuse such forfeiture, it should do so "rarely and only in cases presenting an important legal issue." (*S.B.*, *supra*, 32 Cal.4th at p. 1293.) This is especially true in juvenile dependency cases, which involve the well-being of children and in which "considerations such as permanency and stability are of paramount importance." (*Ibid.*)

Moreover, in the present case, mother has arguably doubly forfeited the issue she is now attempting to raise because, not only did she fail to bring it to the juvenile court's attention, she also neglected to seek timely appellate review of the matter in this court. Generally speaking, "an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150 (*Meranda P.*).) The purpose of this rule is to balance the parents' interest in the care and custody of their children with the children's interest in the expeditious resolution of their custody status. (*In re M.F.* (2008) 161 Cal.App.4th 673, 681-682 (*M.F.*).)

Here, the dispositional order bypassing mother for reunification services was part of an order setting a permanency planning hearing under section 366.26. Since "[a]ll orders issued at a hearing in which a section 366.26 hearing is ordered are subject to section 366.26, subdivision (l) and must be reviewed by extraordinary writ" (*In re Tabitha W.* (2006) 143 Cal.App.4th 811, 817 (*Tabitha W.*)), mother was required to seek writ review of the juvenile court's bypass decision in order to preserve her right to appellate review. (See § 366.26, subd. (l)(2) [failure to file a petition for extraordinary writ review within the period specified by rule "*shall preclude* subsequent review by appeal" of a setting order (italics added)]; see also Cal. Rules of Court, rule 8.450 (e)(4)(A) [when a party is present at the setting hearing, notice of intent to file writ petition must be filed within seven days from the date of the setting order].) This she did not do.

Again, however, this forfeiture rule is not absolute. Rather, it must not be applied if "due process forbids it." (*In re Janee J.* (1999) 74 Cal.App.4th 198, 208 (*Janee J.*).) Generally, the forfeiture rule does not infringe upon a parent's due process rights because

8

of the numerous safeguards built into the dependency system. (*M.F.*, *supra*, 161 Cal.App.4th at p. 682.) Thus, application of the rule has only been found inappropriate on due process grounds when an error so "fundamentally undermined the statutory scheme" that the parent was prevented from availing him or herself of its protections. (*Janee J.*, *supra*, 74 Cal.App.4th at p. 208.) Moreover, "defects must go beyond mere errors that might have been held reversible had they been properly and timely reviewed." (*Id.* at p. 209.)

Mother, of course, argues that this is a case in which her procedural failures should be excused. Specifically, she contends that the error she complains of was legal in nature and was entirely fundamental to her case, depriving her of the many due process protections she would otherwise have enjoyed during the reunification period. We agree that bypassing a parent for reunification services is an extreme decision that has significant ramifications for both parent and child. (See *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 98 (*Cheryl P.*) [" 'The failure of a parent to reunify with a prior child should never cause the court to reflexively deny that parent a meaningful chance to do so in a later case. To the contrary, the primary focus of the trial court must be to *save* troubled families, not merely to expedite the creation of what it might view as better ones.' "].) On the other hand, permitting a parent "to raise issues which go to the validity of a final earlier appealable order would directly undermine [the] dominant concerns of finality and reasonable expedition" underlying all juvenile dependency proceedings. (*Meranda P.*, *supra*, 56 Cal.App.4th at p. 1152.) Ultimately, however, we need not decide whether relaxation of the forfeiture rule is appropriate under the facts of this case. Rather, we conclude that the juvenile court's order denying mother reunification services pursuant to subdivision (b)(10) of section 361.5 was not error, and thus affirm on that basis.

### B. *Validity of Bypass Order Under Subdivision (b)(10)*

As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to "the child and the child's mother and statutorily presumed father . . . ." (§ 361.5, subd. (a).)

9

The purpose of reunification efforts is to "eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 (*Baby Boy H.*).) However, it is also the "intent of the Legislature, especially with regard to young children, . . . that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.) Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. (See *Ibid.*) Specifically, section 361.5, subdivision (b), exempts from reunification services " 'those parents who are unlikely to benefit' " from such services or for whom reunification efforts are likely to be "fruitless." (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 474; *Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 478.) Once the juvenile court concludes reunification efforts should not be made in a particular case, it " 'fast-tracks' " the dependent minor to permanency planning so that a permanent out-of-home placement can be developed. (*In re Rebecca H.* (1991) 227 Cal.App.3d 825, 838.)

The statutory sections authorizing denial of reunification services are sometimes referred to as "bypass" provisions. (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.) In the present case, the juvenile court denied reunification services to mother based on two such bypass provisions, subdivisions (b)(10) and (b)(11) of section 361.5. Since only one valid ground is necessary to uphold the juvenile court's bypass decision, we will focus here on subdivision (b)(10), under which reunification services need not be provided if the court finds by clear and convincing evidence that "the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling . . . and . . . , according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian." (§ 361.5, subd. (b)(10).) This statute

10

"recognizes the problem of recidivism by the parent despite reunification efforts." (*Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 478; see § 361.5, subd. (c).)

We review an order denying reunification services under subdivision (b) of section 361.5 for substantial evidence. (*Cheryl P., supra,* 139 Cal.App.4th 87, 96.) Under such circumstances, we do not make credibility determinations or reweigh the evidence. (*A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 242.) Rather, we "review the entire record in the light most favorable to the trial court's findings to determine if there is substantial evidence in the record to support those findings." (*Ibid.*) Of course, to the extent our analysis involves statutory interpretation, this is a legal matter which is subject to our de novo review. (*Robles v. Employment Development Dept.* (2015) 236 Cal.App.4th 530, 546.)

As stated above, mother argues here that bypassing her for reunification was improper because the orders terminating services and parental rights with respect to T.G.'s half siblings were on appeal at the time of T.G.'s dispositional hearing and therefore could not provide an appropriate basis for bypass. However, pursuant to section 361.5, subdivision (b)(10), bypass is permissible whenever a court has "ordered termination of reunification services for any siblings or half siblings of the child because the parent . . . failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent . . . ." As is relevant to this case, the juvenile court's June 2013 order with respect to C.B. and J.M. (half siblings of T.G.) terminated reunification services for those minors because mother failed to reunify with them after they had been removed from her care. As such, the order appears to comply with the plain language of the bypass statute, irrespective of any possible pending appeals.

Although it does not directly address the issue of finality, *In re Harmony B.* (2005) 125 Cal.App.4th 831 (*Harmony B.*) is instructive. In that case, the juvenile court denied reunification services to the parents pursuant to subdivision (b)(10) of section 361.5 on *the same day* that it terminated services for two siblings, the predicate action for application of subdivision (b)(10). (*Harmony B.*, *supra*, 125 Cal.App.4th at pp. 836, 840.) Harmony's father argued on appeal that the two-pronged test for denial of services

11

under subdivision (b)(10)—prior termination of sibling services and no reasonable effort by the parent to treat the problem which led to that sibling's removal— necessarily required the passage of time between the termination of services as to one child and the denial of services as to another child. (*Harmony B.*, *supra*, 125 Cal.App.4th at p. 840.)

The *Harmony B.* court disagreed, stating with respect to the first prong of the subdivision (b)(10) test: "[F]ather argues that the siblings' dependency proceedings had not proceeded to the point where it could be determined whether he would reunify with them, and he claims that nothing in the record indicates that he failed to reunify with the siblings. Father's argument overlooks the plain language of the statute. The statute provides that the court has previously 'ordered termination of reunification services for any siblings of the child *because* the parent . . . failed to reunify with the sibling after the sibling had been removed from that parent.' (§ 361.5, subd. (b)(10), italics added.) It does not provide that court has 'ordered termination of reunification services for any siblings of the child *and* the parent . . . failed to reunify with the sibling after the sibling had been removed from that parent.' Thus, on its face, the statute does not require any lapse of time between the termination of services as to one sibling and the denial of services as to another sibling to satisfy the first prong of the test." (Fn. omitted.) (*Harmony B.*, *supra*, 125 Cal.App.4th at p. 840.) This analysis—focusing on the fact that the order terminating services *had been made* at the time bypass was sought for another sibling rather than on the ultimate outcome of the first sibling's case—at the very least strongly implies that an order terminating services in a sibling case need not be final in order to support a bypass decision under subdivision (b)(10). (See *Riverside County Dept. of Public Social Services v. Superior Court* (1999) 71 Cal.App.4th 483, 491 [under subdivision (b)(10), the "only requirement" is that the predicate action "occurred" before the disposition hearing at which bypass is ordered].)[5]

---

[5] We note that this analysis applies only to the statutory language of subdivision (b)(10). A different conclusion might be reached under subdivision (b)(11) of section 361.5, which allows for bypass only when the parental rights of a sibling or half sibling of the child have been "permanently severed." (§ 361.5, subd. (b)(11).) Moreover, while

12

Moreover, even were we to hold that finality was required in this case—or was simply preferable when analyzing T.G.'s best interests—we disagree with mother's characterization of the order terminating reunification services as nonfinal at the time of T.G.'s November 2014 dispositional hearing. As explained above, an unappealed postdispositional order is "final and binding and may not be attacked on an appeal from a later appealable order." (*Meranda P.*, *supra*, 56 Cal.App.4th at p. 1150.) Here, because the June 2013 order terminating services for C.B. and J.M. was made during a hearing at which a section 366.26 hearing was ordered, mother was required to seek writ review of that order shortly after the June 2013 hearing in order to preserve her right to appellate review. (*Tabitha W.*, *supra*, 143 Cal.App.4th at p. 817; see § 366.26, subd. (l)(2); Cal. Rules of Court, rule 8.450 (e)(4)(A).) Since mother did not seek such review, the order terminating services became "final and binding." Indeed, mother acknowledges as much.

She argues, however, that the finality of the juvenile court's order terminating services was somehow undermined when she subsequently filed a petition under section 388 seeking return of the minors and/or additional reunification services. Specifically, according to mother, since the denial of her section 388 petition was on appeal at the time of T.G.'s November 2014 disposition and the resolution of that appeal might impact the prior order terminating reunification services with respect to C.B. and J.M., that order was not sufficiently final to support bypass in T.G.'s case. We are not persuaded.

First, we note that mother's 388 petition sought renewed reunification efforts based on a change in circumstances—her demonstrated ability to successfully parent T.G. with supportive services from Through the Looking Glass—and the current best interests

---

finality of the order terminating services does not appear to be statutorily required under subdivision (b)(10), there may be circumstances in which the lack of finality of an order terminating a first sibling's services could lead the juvenile court to conclude that the provision of reunification services to the second sibling might nevertheless be in that minor's best interests under section 361.5, subdivision (c). Factors that might be considered in such an event include: the age of the child; any detriment to the child from the provision of services; the estimated timeframe for resolution of any appellate issues; the likelihood of success on the merits of the appeal; and the contemplated permanent plan for the second sibling.

of the minors, C.B. and J.M. As such, it presented no argument which would undermine the validity of the juvenile court's prior order terminating services. In particular, it was not an appropriate vehicle to attack the court's prior reasonable services finding and, as a factual matter—despite mother's appellate arguments to the contrary—it did not do so. (*Meranda P.*, *supra*, 56 Cal.App.4th at p. 1150 [an unappealed dispositional order may not be attacked in an appeal from a later appealable order].)

Rather, under entirely different legal standards than those confronted by a juvenile court when terminating services, it sought to convince the juvenile court that further efforts at reunification were now in the best interests of C.B. and J.M. But, as the *Harmony B.* court recognized, whether mother ultimately reunified with C.B. and J.M. is simply irrelevant under the first prong of the subdivision (b)(10) test for bypass.[6] (See *Harmony B.*, *supra*, 125 Cal.App.4th at p. 840.) Instead, what was critical is that, as happened here, the sibling case had reached the procedural point where termination of services was ordered prior to the disposition in T.G.'s case. Under such circumstances, a pending appeal on a related petition under section 388 does nothing to undermine the finality of the prior order terminating services for purposes of subdivision (b)(10). Indeed, to conclude otherwise would be to ignore the Legislature's clear intent, "especially with regard to young children, . . . that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M.*, *supra*, 80 Cal.App.4th at p. 1151.)

---

[6] In the appropriate case, however, later successful efforts at reunification might support an argument under the second prong of the subdivision (b)(10) test: that a parent had "subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . ." (§ 361.5, subd. (b)(10).)

14

We therefore conclude that the juvenile court's bypass order under subdivision (b)(10) of section 361.5 was proper and amply supported by the evidence before the court.[7]  Given this determination, the juvenile court's decision to bypass reunification services in this case provides no basis for reversal of the juvenile court's subsequent order terminating mother's parental rights with respect to T.G.

## III.  DISPOSITION

The judgment is affirmed.


_____

REARDON, J.


We concur:


_____

RUVOLO, P. J.


_____

STREETER, J.

---

[7] Mother does not argue on appeal that the juvenile court's bypass order was improper under the second prong of subdivision (b)(10), which permits bypass only where a parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . ."  (§ 361.5, subd. (b)(10).)  In this regard, we note only that T.G. was removed from mother based on the same mental health issues, substance abuse concerns, and neglectful parenting practices that initially placed C.B. and J.M. at risk.  As the record more than adequately demonstrates, mother has not made a reasonable effort to treat these issues since the March 2012 removal of C.B. and J.M.

15

Trial Court:                    Alameda County Superior Court


Trial Judge:                    Hon. Charles A. Smiley


Counsel for Defendant and       Mary R. Williams
Appellant:                      First District Appellate Project


Counsel for Respondents:        Melinda L. Capozzi
                                Miruni Soosaipillai
                                Office of County Counsel

*In re T.G.* A144548

16